The first is No. 22-1936, Netflix, Inc. v. Avago Technologies. Mr. Batts. Good morning, Your Honors. May it please the Court, Harper Batts on behalf of Appellant Netflix. There are two distinct issues that I'd like to discuss with the panel this morning. And I'd like to start with the issue of Master's Figure 9. The only issue that- Yes, and that's where I was going, Your Honor. Yes, Your Honor. So that is the- the reason I wanted to start with Figure 9 is because that is the only issue that needs to be addressed for the arguments regarding Master's Figure 9. If this Court on de novo review rejects the Board's claim construction, that's the only issue that would- the only basis for the rejection. But in response to Judge Dyck's point, it would be helpful if you would offer what you think is a correct claim construction. Sure. So we believe that it is clear from the claim language itself, Claim 1's claim language, the dependent claim language, the specification of Avago's expert's testimony, as well as their infringement contentions, that when it refers to performance data, it includes not only instance-level data, but it also refers to the other, like the tier levels, the other application tier and the host- Host and tier-level data. Correct. And I think that's consistent with the claim language. Is tier-level data broader than host-level data? There's different types of tiers. I'd say an application tier would be narrower, and then a host tier would be broader. But I think there are actually different tiers. I don't know. When you're asking which one is broader, I think they're different. So- Well, I mean, you're relying on dependent claim 5 to say that performance data includes tier-level data, right? Correct. So what is tier-level data? How is it defined? I know there is a reference to it in the specification here. What is your inference? Application-level data, for example, if you're running Adobe Acrobat, you would have multiple copies of Adobe. That's application-level. Application tier would be a series of applications. So you could have Adobe, maybe Microsoft Word, other applications. You're talking about a series of applications, and you're looking at the tier of the applications. Host-level data then is talking about, for example, the actual server that's being run on. You're looking at the server, the CPU utilization. Well, how does tier-level data relate to host-level data? And Masters relates to host-level data, right? Well, clearly, Masters does relate to host-level data, but it has all the sets of data. It's saying it's collecting the data at all these different levels. Okay. So how does host-level data relate to tier-level data? How is it different? So host-level data is looking at how the application instance, the relationship of the application instance to the host and what is occurring on the host. So for CPU... For a particular machine. For a particular machine. So if you're looking at the CPU utilization of a machine, and you're looking at multiple instances of the application running on that machine, you can look at what is the correlation of that data between the application instance and the host. I don't want to jump right away to Figure 8 in good examples of where you can see the actual host data, the CPU usage data, and you see how it's being affected by different application instances either being created, destroyed, or migrated. So what we have is, if you look in the specification and we slide it to the... So... Sure. I mean, I understand your argument about dependent claim 5 and tier-level data, but what's the basis for saying that claim 1 also covers host-level data? So I would point, Your Honor, to Appendix 1428. This was a VAGO's expert's testimony on this exact question, and we asked him about, what do you mean by characterizing the performance of said application instances? Is 1428? Appendix 1428. Is Dr. Rosenblum? Correct. And he states, Does your jumping to that suggest that there's no intrinsic evidence to suggest one way or the other whether it applies to host-level data? Well, I certainly... I think we look at the claim language itself, right? You start with the claim language. Claim 1 is... The language of claim 1 itself is not limited to application instance level, because it's saying application instance level, and then it has a where-in clause. It could have just ended at that. Wait, wait. That's a different issue. We've gotten beyond that. We're assuming for the moment that you're right, that because of dependent claim 5, it extends beyond individual instance data to tier-level data. The question is, what's the intrinsic evidence that shows that it applies to host-level data? It's the specification then, Your Honor, because the specification has clear examples of host-level data. So I would point you to Appendix Page 43, Column 4, Lines 3 through 8. It references that there's collection that can gather and analyze data for particular targets, e.g., web clients, web servers, networks, application servers. All these are referring to host-level data, and that's what I was saying was consistent with Dr. Rosenblum's testimony on Appendix 1428, where he says the performance data about CPU utilization, so host-level data, could be associated with individual application instances of an application. So we have the tie-in is that Avago has conceded that the construction is excluding embodiments, right? In their briefing, they conceded the fact that this construction excludes embodiments, and those embodiments include the application tier as well as the host-level data. And they haven't shown any probative evidence, any explanation for why you would exclude embodiments here. And we have the dependent claims that are showing that the board's construction is clearly wrong, and it's not limited as they construed it to the application instance level. Mr. Bassett, you cited Appendix 43, what column? Column 4, Lines 3 through 8, Your Honor. Okay. And then, I mean, there's more. There's Appendix 43, Column 3, Lines 56 to 58, where it discusses the performance metrics on servers running target applications. So the specification is consistent with Avago's experts' testimony, and it's also consistent with their infringement contentions from the district court, where they pointed to CPU usage. That's the metric that they pointed to in the district court to say that would be satisfied. Now, are you urging us to the... It's not really clear, I guess, if the... By implication, there was kind of a board claim construction here, but it's not really clearly spelled out, I think. Correct me if you think I'm wrong. But do we need to... Should we construe the claim, or if we agree with you, or should it go back to the board for construction? I think you can do either, Your Honor. I think clearly we set forth in our reply brief, as I mentioned, the infringement contentions, they said, very broad. They raised in their patent on response a narrowing construction. In our reply brief, we had a section called claim construction. This was in the section. We set performance data. They're wrong about this narrowing. The board discussed it at the oral hearing. So I think there was clearly... And then you see the decision. There's clearly... They even meant... They call it an implicit claim construction. It's a claim construction, Your Honor. So I think it is for de novo review, and I think it's clear that they erred in limiting it in this fashion, so that you can either provide them the construction saying, here's what's wrong, and it should be this broad, or you can send it back and remand it back for them to make that determination with your guidance. I think either way is appropriate. Okay. If we're past the performance date, unless Judge Schall has further questions about that, let's talk about the correlation issue, which, as I understand it, we would have to decide with respect to Figure 8, because the board's decision with respect to Figure 8 of MASTERS rests on two grounds. One, performance data, and the second is the absence of correlation, even if you assume that the figure shows performance data. Correct. And I do think that the board clearly abused its discretion in not considering MASTERS Appendix J. So appendix is on a CD, a physical CD, but it's part of the MASTERS prior art reference. So you're saying it's intrinsic evidence? It's intrinsic evidence, Your Honor, and we provided it to them. There's multiple reasons why this would be rebuttal evidence, proper evidence, intrinsic evidence, whatever. The board literally, the decision is silent as to this evidence. And Avada's response in the briefing here was, well, they disregarded it. It was untimely. There's not even briefing on that issue below, let alone a ruling on that below. And if you look at MASTERS Appendix J, and I It is spot on, blows up every argument Avada has about Figure 8. This is the path display, the Figure 8 is the path display. And on 1338, second paragraph, it talks about the primary purpose of the path display is to show the conditions in the system. And then it goes on to say for scale up events, scale down events, and moves. Which page is this again? 1338, Your Honor. So the second paragraph. So you see in the second sentence there, it talks about the different actions. So a creation event, a destruction event, and a move, a migration event. And it goes on to talk about the QOS metrics. So the performance metrics that are occurring there. And it keeps going. The detail on these four pages is key because the very next page, it talks about a message, the first line. The message notifies the path display when a new process is started, i.e. a creation event. The path display adds this There can't be any doubt that when a new creation event occurs, what you see for a new line in this colored figure, this is a colored version of the figure if you look on page 1341, this is a colored version of Figure 8 from Masters. So you can see each line has a different color and represents a different application instance and what's occurring over time for the performance metric of review time. 1341 doesn't show any colors. 1341? Yes, it does, Your Honor. Not ours. Not in the appendix. I apologize, Your Honor. It's hard to see colors there. There's color. Oh, you've got some colors. There's colors in it. And you can see the tie-in from the specific instance. But your copy is not the same as ours. If you want us to look at a colored version, you've got to supply us with a colored version. I apologize, Your Honor. I'll look into that immediately. That would be helpful, yeah, because it's yours does, but it's Judge Dykstra's. But even without the colors, Your Honor, this language explains the specific how a creation event or a migration event or a destruction event is being added into the graph. And what we have here when you ask about your correlation question, you have here the specific, you can see the specific metrics for each application instance. So this is not, it doesn't matter what the claim construction is for each application instance. It's showing the correlation. And this was the exact example in the specification because you asked for correlation. Well, what could be correlation? Well, again, their expert and the specification are consistent because the specification on column two, lines three through seven, appendix 42, states correlating the performance data to one or more life cycle events may also comprise determining the change in performance of the application as the one or more application instances are created and destroyed. Where's this exactly, Mr. Banzer? Column two, lines three through seven of the 722 patent, Your Honor. Column two, lines what? Three through seven. Of the three, 722? 722, Your Honor. So what does the patent itself say is an example of correlation? And that's exactly consistent with Dr. Rosenblum's testimony on appendix 1453 that we also cited, where when we asked him about what would be for claim one, what would constitute correlating for claim one, and he said perhaps the most basic kind of correlation would be to say, here's what these performance metrics, here's the values these different performance metrics had at the time of a particular life cycle event. That's exactly what's being shown in MASTERS. So they said, hey, MASTERS figure eight doesn't really show this. We have the actual intrinsic evidence from MASTERS appendix J that shows their arguments are wrong. And we discussed this at the oral hearing, Your Honor. We had the arguments about it. It was submitted to them before three depositions of our expert, and the board just doesn't address it in their decision. I don't know what could be a further example of an abuse of discretion under an APA and an agency not considering the exact evidence that shows why the arguments were wrong. Right behind time here. So the bottom line is you want us to decide performance data, and you want us to decide correlation taking into account appendix J. That's it, right? I think those are the two issues, yes, Your Honor. Okay. All right. We'll give you two minutes for rebuttal. Thank you, Your Honor. Mr. Young. Good morning, Your Honors. May it please the Court. Dan Young from Evago Technologies. I'm going to address the two issues that Mr. Bass discussed with you in just a second. The one thing I do want to say at the outset is that this is a case where the board specifically found that the petition does not present an identifiable, consistent, or cohesive theory of unpatentability connecting the antecedent basis for each of the limitations. In other words, that's an abuse of discretion standard. They looked at the petition, and they looked at all four of the elements, the collecting, the detecting, the correlating. Yeah, maybe if they'd stopped at that point, you'd have an argument that they did go on and Yes, Your Honor, they did. Construe a performance data, right? Well, Your Honor, as you asked Netflix's counsel, what is their construction? What did they propose? They didn't propose a specific construction. It was plain and ordinary meaning, and what the board said was they looked at the language of the claim. It's always baffling to me. This happens constantly at the board. People are saying plain and ordinary meaning, but it's not really what they mean. They have different versions of what plain and ordinary meaning is. This happens constantly. That seems to be this situation. Well, Your Honor, what the board looked at with respect to this particular term is Just one question. I don't think I'm throwing this discussion off course, but what do you understand was the board's construction of performance rate? Well, I think what the board found was that the performance data, and I'll use Figure 9 as an example, that type of CPU data where it's just the data for the CPU that's running various applications, that itself they didn't find was fall within performance data for one or more application instances. That we're in provision that they rely on, that associated language. But is there a place in the board's decision where you say, we can go and see the board saying, here's our claim construction? No, Your Honor. It's implicit? Yes, Your Honor. It's implicit that it's limited to a single application instance, right? No, Your Honor. The claim language specifically says one or more application instances. What do you understand their construction to be? Well, I understand with respect to, what the board did was it looked at the construction in lieu of figures 9A and 9B, which is what we're talking about. What the board said there was that there was not an explanation as to how just CPU data. Did they have a construction or not? They did not have it. They had an implicit construction. What is the implicit construction? The implicit construction is that the CPU data that you see in figure 9B does not fall within the scope of the claim language. No, no, no. That's not sufficient. Articulate in words what you understand their implicit construction to have been. I understand their implicit construction to be that the performance data has to be related to one or more application instances wherein the performance data is associated with the performance of the application. Does it include house data? Does it include tier data? Potentially, Your Honor. Potentially it does? I'm sorry, Your Honor. Potentially? Potentially it does. It depends on. So like what Dr. Rosenberg said specifically in his testimony, this is on page 74 columns of lines 1 through 8 of his testimony. He says that the performance data as that term is used in claim 1 requires the ability to determine performance of individual application instances. So for example, if you had all the instance data that were running on a host computer and they tallied it up, but you could individually go back and figure out, well, this instance is performing this way, this one's doing that, then that would include that data because it does associate, it is performance data for one or more application instances. The wherein provision that they rely on was added during prosecution. It's added to narrow the claim, not broaden the claim. So for example... Wait, wait. So... Yes, Your Honor. You're saying that you can't go back and parse the data in the way you just described? I don't know, Your Honor. It's certainly not described at all in the specification. The specification mentions figure 9 in a single sentence in the collecting limitation. I don't think there was any argument between the parties on this point as to whether the pick out the individual instances from that. I mean, it's really sounding to me as though the two of you don't disagree that much as to what performance data means. Well, certainly performance data as it's reflected in the figures that they use as these examples, certainly doesn't show performance data that would satisfy the definition. Now, is it possible somewhere in MASTERS? Potentially, but the board's position was... MASTERS doesn't show performance data that falls within the correct definition. Well, for example, if we're looking at figures 9A and 9B, what that says is, it's specifically called a decision review display. That's what it is. So what MASTERS is talking about, the entirety of MASTERS is talking about the RMA, the resource management architecture. What this is, is an architecture that creates and manages these instances. I thought the board said that figure 9 doesn't show performance data. It doesn't show performance data as it's related to one or more application instances. So what you see in figure 9A... What do you understand that to mean? What they're saying is that the performance data that's shown in figures 9A and 9B, that data, what it's showing there, is data related to the RMA. In other words, at the top of the figure 9A, it shows how fast the RMA made the decision that says, hey, we need to do a scale up event, and then how long it took to implement that decision. That's data related to the RMA, not related to the individual application instances. It's not saying... Could you just agree that it could be aggregate data? Sure, your honor. There could be a situation where you have aggregate data... I'm not understanding. I'm sorry. I'm not understanding. Okay, so your honor, I'll take a step back. What the board found in its final written decisions was that the response time data that you see in the very top of figure 9A, that's showing how fast the RMA is making a decision. That's not performance data related to the application instances. That's performance data related to how fast, how the RMA is performing. So like an example, when you say response time in the shame patent, the 722 patent, that would be like, you have an application running, how fast does it address a client request? The client comes in and says, I want you to do X. How fast does that application perform that task? Which, what you're seeing in figure 9A and 9B, and what the board found, that's something different. That's how, that's the overall structure deciding, I need to do an event, and then how fast it will take me to implement that event. So those are, and then the board found, those are kind of two different buckets of data. And the petition doesn't provide any explanation as to how that data that you see in figures 9A and 9B relates to the claim language. That's what their findings said. So this, what you've been saying in response to your, Judge Dyke's question, seems to again go back to claim construction. The construction of performance data. Now, correct me if I'm wrong, but it seems that both you and Mr. Bax say that there wasn't an express claim construction here, but there was an implicit claim construction. Both seem to say that. Assuming we look at that implicit construction and disagree with it, do we construe the claim ourselves, or do we send it back for the board to take a shot at it? If you disagree, the board would have to make that decision. The board did not come to a conclusion that says... Wait, why does the board have to make a decision? Claim construction is de novo. We can construe the claim. Well, the claim, Your Honor, what the board did was it What's the answer to that? We can construe the claim, right? Yes, Your Honor. But what the board's decision was, was related to the adequacy of the petition. And the petition didn't set forth as to what... Because with the petition... The adequacy, that's right. I mean, you read the board decision, it says that. But it seems that underlying the board's view on that as to the adequacy of the Don't we have to... I mean, if we disagree with that implicit claim construction, we could send it back and we could decide. But doesn't it make sense, as perhaps Judge Dyke was suggesting, that we should articulate a claim construction? Yes, Your Honor. What the board expressly found was that the petition doesn't provide any explanation as to how the data that's reflected in Figures 9A and 9B satisfies the all four elements of the claim. That's what they said. But that was based on a view of performance data, correct? It was based on performance data and what was described in the petition. And the petition doesn't... But it was based on the... Excuse me, but it was based, I think, and correct me if I'm wrong, but it was based, as you said, on what was described in the petition and as to the view, as to the board's view, apparently, of performance data. Is that correct? It was absolutely how the board viewed the limitation, the entire limitation, which says performance data for one or more application instances. And they're like, well, this is just CPU data in a vacuum. So that's the view's decision hinges on a claim construction, right? Yes, Your Honor. Okay. That's what I'm saying. If we agree with that construction, fine. But if we disagree, is there anything to prevent us from saying, okay, here's what we believe is the correct claim construction and sending it back? Your Honor, I think there's two things, and this is maybe the source of a little bit of confusion. The two issues are adequacy of the petition and then, as you say, claim construction, right? So the board focused primarily on the adequacy of the petition. But I understand what you're saying, and there is an underlying construction there. And what the board said was, again, with figures 9A and 9B, they said that was data related to the RMA. No, I understand. Where does it say that? 16 and 17, where does the board say that? So, Your Honor, this would be on, yes, appendix page 17, where it says further. And again, this is related to what the Netflix cited to certain portions of the specification to support it. And what the board said further, the cited portions of the 722 patent do not support petitioner's implicit claim construction. Both the cited portions of the 722 patent refer to application instances response time in servicing a client request, not the system's response time in creating an application instance. And that seems to be saying that aggregate data is not performance data. Am I wrong? Isn't that saying that aggregate data is not performance data? Your Honor, you could, I mean, what it expressly says is it says that... No, no, answer my question. Yes, no, maybe... Potentially, Your Honor. I think potentially would be the answer. Because what it's talking about is servicing a client request. That relates to the RMA. That's what I kept trying to say, that servicing a client request... I apologize, I got that backwards. Servicing a client request is what the 722 patent is talking about. And it says not the system's response, and the system's response time is the RMA. That's what it's talking about. It does seem, and correct me if I'm wrong, Mr. Young, that your position stands or falls on whether this implicit claim construction was correct. Because you're home free. If it wasn't, then you have a problem, perhaps. Well, Your Honor, certainly with respect to the collecting limitation, that's true. The board didn't make any findings with respect to figures 9A and 9B with respect to the correlating limitation. I understand that. But let's turn to the correlating limitation for figure 8, because that's an alternative ground that they articulated with respect to figure 8. And that seems to ignore Exhibit 9 of MASTERS, and that's a problem, right? I'm sorry, Your Honor, Exhibit 9 of MASTERS? I mean, Exhibit J of MASTERS. Yes, Your Honor, the issue with Exhibit J, and it doesn't add, Exhibit J doesn't add anything to what you see in figures 8A and 8B. What that is showing is that, and the board found this, talking about it on page 20 of their opinion, what the RMA does is it looks at it as a threshold. That's that horizontal line that you see going across figures 8A and 8B, as well as what you see the horizontal line in the Appendix J figures. They're really the same situation. What it does is it looks at a threshold. It looks at the application instances and how it compares to that threshold. That's how it makes the decision about whether or not to do a certain action. That's what the board found. Appendix J was added, so Appendix J is not in the petition. Appendix J was not relied on by their expert in his declaration. No, but if it's part, Appendix J is intrinsic evidence, is it not? Yes, Your Honor, but what the board looked at this decision is the adequacy of the petition. Appendix J was provided a day before we were going to depose their expert on his... But it never said why they didn't look at Appendix J. That's true, Your Honor. They did not. The Appendix J, still at the end of the day, the board's opinions with respect to Exhibit 8A and 8B remain the same. What it said was, all you're showing is continuously looking at an application instance, in this case a couple of them. Then they say, oh, well, an application was added in Section 13, 34. All you're seeing is that those lines. There's not a correlation between... What the patent will say is that if you add an instance, as an example, that the other instances drop or they rise in their performance. When we ask their expert about this, you'll see those lines going up and down without even a new instance being added. You're not isolating the change with respect to that particular instance. All you're doing is tracking application instances. That's been in the prior art for a long time. That didn't add anything to what was already in the prior art. All you're doing is tracking applications. If you were then to isolate and say, okay, when we add this, this is how it impacts these other instances, well, then they may have an appendix J. It doesn't add anything to that disclosure. Well, okay, but shouldn't we hear from the board as to what it thinks about Appendix J? I just don't understand why they didn't mention it. Well, because, Your Honor, I think what the board did was they focused on the adequacy of the petition. The entire decision that you read is all about the adequacy of the petition. Appendix J was not mentioned in the petition. They did not file a motion. They didn't file a motion to supplement... ...that arguments develop in the course of the IPR. That's something the board has to accommodate itself to. Well, the board noted in the oral argument that they did not file a motion to supplement the information from Appendix J. When they provided it, they didn't provide any explanation as to how they were going to even use it. They just said, here's 100 and some odd pages of... But if it's intrinsic evidence and part of the patent, isn't it necessarily there and can't anyone look at it, particularly in response to the ebb and flow of arguments before the board? Well, I think the proper procedure, Your Honor, would be to get the application J, file a motion to supplement authority, and say why you're going to have it. They mentioned it in the reply? They did mention it in the reply. And you had a sir reply. We did, Your Honor. And the board's decision on Figures 8A and 8B, the exact findings that they made would be applicable to 8A and 8B as well as Appendix J. All right. I think we're out of time. Thank you. Mr. Batz, you have two minutes. Thank you, Your Honor. I just have a few points here. I think you've heard now the parties agree that there was an implicit construction that was performed below with respect to performance data. I think when you ask what would our construction be, I think the one that I have is that, and it sounds like we're very close to them, any data that is related to the performance of one or more application instances. He used the term related to. I think that's similar to associated with, but if you want to do a specific construction, but clearly... What do you think the board's implicit construction was? Well, the board specifically said that they were denying rejecting our arguments with respect to based upon performance data. So they specifically said on page 11 of their... Page 12 of the final written decision, they said, well, it's a broad term. Petitioner does not adequately establish that. And then it goes on to say that this language, the claim language, includes such a broad variety of data as application level data, tier level data, and host level data. So they're clearly rejecting that the term included any of those sets of data. And then on page 17 of the final written decision, they said, quote, further, the cited portions of the 722 patent do not support petitioner's implicit claim interpretation. So they clearly made a determination based upon claim construction here. And I think the next issue I'd want to point out is that there were several new arguments that were made below. But if we go to the Masters Appendix J, he said Appendix J doesn't add anything to Masters Figure 8. And I have to strenuously disagree with that, Your Honor. I think just the pages that I pointed out to you make clear that there are a lot of additional teachings in the Appendix J that are direct rebuttals to their arguments below. And for him to conjecture here about what they could decide or what they could have thought or what they might have thought doesn't go to the question of we have nothing by the board, not a single reference to Appendix J in the final written decision to even appeal to you. So he mentioned supplemental evidence or... I think we're out of time. Thank you, Mr. Bass. Any further questions, Your Honor? No. Thank you, Mr. Young.